Your Honor, it's the second case this morning, 208-182, people of the state of Illinois v. Gregory Tomberg. On behalf of the F.R., Ms. Margaret Anne O'Connell. On behalf of the appellee, Ms. Cynthia Schneider. Ms. O'Connell. Good morning. You may please the court, counsel. My name is Margaret O'Connell and I represent Gregory Tomberg in this matter. I'm here today to ask you to consider reversing this case and sending it back to Judge Anderson for a retrial. Whenever I prepare for oral argument, I always like to ask myself, what is the one thing that I know that I've written in my brief or in my reply brief that I know is written on the page but is so important that must be verbalized? There are certain things that just don't jump off the written page that are important and pivotal in cases. In this case, I think that it can be fairly surmised as relationships. It's important for this court to look at the relationship that existed between all of the parties. Certainly, it wasn't unusual that my client, Gregory Tomberg, would know Darcy Mickow. It wasn't unusual that my client would know Darcy's father, Terry Mickow. The fact that Terry Mickow's father is a police officer, retired off the force from Itasca for over 20 years, and the fact that this case was investigated by the Itasca Police Department, I think is of interest to this court. Why is that? Because I think that given the fact that Terry Mickow decided when his son came to him and disclosed, even if you look at the disclosure that Darcy initially made, it doesn't even rise to the level of a criminal offense. But Terry Mickow decided at that point not to just call the Itasca Police Department and see who they would assign to this case. He reached out to his good friend, Emil Cargola, who is a detective with the Itasca Police Department, and handpicked him to be the man to investigate this allegation that his son had made against Gregory Tomberg. Now, is that in the record that that assignment was made by him? Is that part of the record here? Yes. The testimony from Terry Mickow, as represented in the record, is that Darcy comes to him after being prompted by his girlfriend that he should disclose to his father what it was that he had disclosed to Amber, which was that he thought that something may have happened inappropriately between he and Greg. Then Darcy does disclose to his father, and then his father does not call. Originally, it was thought that this was a 911 call. It is through effective cross-examination at trial that it's brought out that it wasn't a 911 call, that Terry Mickow handpicked the investigator and chose his friend, Emil Cargola, a man that he had known for over 20 years and a man who Emil Cargola testified during cross-examination at trial that Terry Mickow was, in fact, his supervisor. At certain times when Terry Mickow was, in fact, employed by the Itasca Police Department. How does this tie into legal issues? Are you saying that because there was a custodial interrogation, there was some overreaching because, allegedly, your client confessed, and that brings up some legal issues about being in custody, proper Miranda rights being given? Sure. How does the background and the friendship bear on the legal issues surrounding the confession? Well, the relationships that existed between Terry Mickow and Emil Cargola, clearly, I think that's clear. What's interesting is that my client knows Emil Cargola because of the fact that he's a friend of the Mickow family, and as is Emil Cargola, which is not unusual, obviously. But for the sake of the argument, you're right. There's a friendship there. Sure. There's a long-standing friendship. They know each other. Your client, it turns out, was a former police officer, correct? No. He was never in law enforcement. He had police training. He was a cadet when he was 14 and 15 years old with the Itasca Police Department, and then he worked for the Hultman Police Department for a very brief period of time, never went to the academy, never was involved in any sort of law enforcement. He wasn't a sworn officer, but he had some experience of dealing with police officers. He had worked at a police department, so yes, he did have some experience in dealing with police officers. So he knows the detectives. He ends up going to the police department again. How does this tie into the legal issues? I believe that it ties into the legal issues, especially as to our issue number two, that the relationship that existed between Emil Cargola and my client was such that the confession that was attained in this case was, in fact, coerced. Looking beyond it, and I don't want to look beyond... Excuse me. The argument you're making now that these relationships, this was made in a trial court? Oh, it's not a credibility question, right? Sure. I mean, was this argument made? Yes, it was. And it ultimately is a credibility question, whether or not these relationships make certain detectives or certain officers less believable in their description of what happened. Yes. And so you're asking us, on the basis of these prior relationships, that we should find that the trial court's conclusion in this was contrary to the manifesto area? Yes, absolutely. And that issue, the relationship issue, goes more toward the coerciveness, as we alleged in our brief. The question of Miranda, though, is clear. I think that when two plainclothes police officers come to your parents' home, and you're out on the front lawn, and they say to you, we need to talk to you regarding an ongoing investigation, and then when my client says to Emil Cargola, a man that he knows, what is this about? And Emil's response is, we can do it the easy way, or we can do it the hard way. It is clear at that point that they are looking to arrest my client. They should have Mirandized him prior to putting him in the unmarked squad and taking him down to the Itasca Police Department. Counsel, what are the formal conditions of arrest in this case? Because, obviously, that's in the mix. Whether that is in custody, we would look to, normally, whether there's a formal condition of arrest. So, was he handcuffed? Was he restrained? Was he searched? What is there that turns this into a custodial situation? The fact that they take him from his home, if they just wanted to talk to him, why couldn't they just talk to him right there at his parents' home? They then decide, they had already decided, and Cargola's testimony at trial is that he drove past the house just to make sure that Greg was actually home at that time. So, he knew that he was there. He knew that he wanted to take him down back to the Itasca Police Department. They take him back there in a squad car. They don't say to him, why don't you meet us down there? We need to talk to you about something. He says to my client, we can do it the easy way or the hard way, when my client just asked the question of, what is it that you want to talk about? Does Cargola acknowledge that he told your client, we can do it the easy way or the hard way, or is that your client's testimony? They then both sit in close proximity to my client. At that point, you really do have that indicia that he is in custody. And this is what the U.S. Supreme Court spoke to us in the, is it Cyber Decision? I'm sorry, Stansberg. And they talk about how it is that officers who engage in this type of conduct really do run the risk that a superior court will disagree with them. I think that's exactly the tactic that was run here by the investigator, Emil Cargola. He knew what it was that they were doing. They did seek to take him into custody initially. I'm sorry, I did misspeak. It was cyber. And there, the U.S. Supreme Court tells us that we have to be very careful because the cyber case is very unique to the extent that the officers admitted that this is what they were doing when they were using that question first tactic. Where they get all of the good information that they want. They then know what it is that they want the target to say on tape. And then they decide, after they get all of that information, we're going to Mirandize him. In this case, all of the trappings of cyber are found. The officers don't admit it, unlike the cyber case. But certainly this court can look at the factors enunciated in that case and make a determination as to whether or not those factors are in fact established. I certainly assert that they were established and that the statement, confession, that my client gave should have been suppressed because it was in violation of Miranda. I thought you were reading a cyber case. For cyber to apply, doesn't the defendant have to be subjected to a custodial interrogation? Yes. Well, we're going full circle. The state's going to argue, I don't want to anticipate their argument, that there was no custodial interrogation. Ergo, there's no cyber violation. How is there no custodial interrogation when someone is in a locked room in a police department with two police officers who start asking him general questions, saying to him that there's a general allegation that you touched a young boy. Unless the trial court found there was no custodial interrogation, didn't it? Yes, he did. And our position is that he was just in error. I was just asking sort of a question of lock. The impact of cyber doesn't come forward until there's a final custodial situation. Correct. And I think that it's instructive in cyber when they talk about the fact that the trial courts really do need to take the holding of cyber, but also must balance that against the fact, which was very rare in cyber, that this officer actually admitted to this question first tactic. Just because you don't have that, and just because those officers didn't testify to that extent in DuPage County, doesn't mean that this court can't say all of the trappings of cyber were there, in that it was, it turned custodial prior to Gregory Tomberg confessing to this matter, and therefore he should have been given Miranda, and we shouldn't allow law enforcement to benefit from that type of a tactic. Rather than spend all your time on the Miranda custodial matter, because I think that's fully brief, the arguments are fairly clear, you know, the standard, you also have issues about jury instructions and other crimes evidence, which are also very significant. Yes, sure. As far as the other crimes evidence goes, this court obviously is very well versed in the Cardamone opinion, which I did cite in my brief. Here, really, the problem that I take with Judge Anderson was that he merely states on the record, I have balanced and weighed all the factors, and I would agree, certainly there is strong evidence, but all the evidence that the state admits is evidence intending to convict. He then further goes on to say that he is comported with 115-7.3 and the Donahoe opinion, but he doesn't tell us how it is that he balanced those things in order to come to his decision. So you're saying he announced a conclusion, but he did not articulate what specific factors he weighed, which you believe the case law requires. I do. I think the case law and the statute require that. And I think that it's fair also for my client to have known that at that point so that he could properly prepare his defense. This was in a pretrial setting. So I won't belabor that point. The other issue that you spoke of that I should address is, of course, the question regarding the jury instructions. I guess I'd like to ask a question about that. Sure. You do acknowledge the general rule that the state doesn't have to prove the precise date when that's not an element of the offense, and where the state does, well, especially where the state does prove that it's happened during the period of time that the statute of limitations is applicable, and, of course, before the indictment is returned, and that there's an exception to the general rule. But you make a statement specifically, and I'm going to quote it. Courts have also ruled that the giving of the IPI criminal second number 3.01 may result in reversible error where the defendant is misled in presenting his defense or where the defendant presents an alibi defense to counter the alleged date. I think that's on page 67 of your brief. Yes. And you cite two cases in support. How do you read those cases to stand for that principle or to support what you've just said? One of them doesn't even discuss jury instructions at all. Well, this case, as far as the jury instruction, I think that the jury instruction issue has to be read with the issue regarding the bill of particulars and the amount of work that went in in defining the bill of particulars and the request from the defense. Ultimately, the defense asks for the bill of particulars to narrow down the time frame. Instead of narrowing the time frame, the judge expands the time frame and allows for another superseding indictment. But that contains certain events that actually focus a little more specifically on when within, even though expanded time frame, these particular incidents occurred, correct? Correct. But then the defense has the ability and the right to say that that's fine if you're going to expand it, but then we need to be more specific as to what specific allegations we're speaking of. After all of the pretrial work is done as it relates to the bill of particulars, we then come to our jury instruction conference and basically all of the work done here is nullified because of the rejection of our proffered IPI instruction. So that's where we get into, that's where the proposition here that you've cited rings true. I'm sorry, I don't follow you. It has to relate back to the bill of particulars. The fact that the court didn't allow this particular jury instruction nullified the prior rulings as it related to the bill of particulars. And so that's why you cited these two cases, because they dealt with bills of particulars? Reading everything in concert, yes. The last issue is the question regarding my client's sentence and the order of restitution. In the sentencing hearing, the question of whether or not the court engaged in a meaningful balance of mitigation and aggravation, I believe that we've fully briefed that issue. Disturbingly, though, in the sentencing hearing, the state is allowed to basically impeach a non-victim in this case. You'll have additional time. Thank you. Thank you, counsel. Ms. Schneider. Good morning, Your Honors. Good morning. Counsel. Going to the defendant's first issue regarding whether or not he was in custody and whether or not the confession that he gave at the police station was voluntary. We put these two issues together because we believe that they're intertwined and that they're based on the same set of facts. And those facts show no coercion and no overreaching by the police officers whatsoever. When you go through the facts, the police officers came to the defendant's house. They asked him if he would go with them. The defendant said the statement about we can do this the easy way or the hard way, that was not the police officer's testimony. It should be emphasized that the trial judge found the police officers to be, quote, very credible. Excuse me. When you say that wasn't the police officer's testimony, did they specifically deny saying those words? I don't recall whether it was a specific denial, but they certainly did not include those words as part of their testimony or admit making them. Her explanation was that they didn't say either way. They didn't deny it. They didn't remember or something. I don't recall whether or not they specifically denied it, Your Honor. I'm sorry. So as you're standing now, we don't know, I mean, we don't know what the record, I mean, we have the record, obviously, but I mean, did the officers, so we don't know what the officers said to the guy. Two things. One, the other one that's not been mentioned yet by you is we need to talk. Whose version is that? Is there an agreement on that? The police officer said we need to talk to him? There is an agreement on that one. There is or is not? There is not agreement on that. Is there an explicit disagreement? No, I don't think there is. It's one where the officers weren't able to articulate the precise words that they used. However, in context, it should also be remembered that the defendant was tending to a young boy in the yard, and the officers allowed him to go into the house by himself to get the boy taken care of before he went to the station. Well, I'm trying to find out, do you think it's significant to the determination of what we're looking at here, whether the officers used the words we need to talk to you as opposed to we want to talk to you or are you willing to come with us or please come with us? Those words can make a big difference, right? Actually, in the context of this case, I don't think they can, and I thank you for asking the question that way, because the police officer's behavior was so not overbearing that I don't think the use of the word need rather than want would make that much of a difference. They allowed the defendant to go back to the house. The defendant rode to the police station in the car in the front passenger seat, clearly not under arrest. They went to the police station. Now, counsel makes much of the fact that the defendant was, quote, flanked by two officers and that the police officers unlocked the door and put him into the room. Well, if I were going to a friend's house in their car and walked to the front door with them, they may well flank me. In other words, I'd be walking between them, but that's not necessarily something that's custodial. That's how people walk from a car to a building. What about this room? Now, counsel seemed to infer that the defendant was in a locked room, but I recall, didn't the record indicate the room was unlocked from the inside? I believe that it could be open. I think it could be open from the inside, yes. So it wasn't really locked in a room? No. Because that would obviously be strong evidence of somebody being in custody if they're locked in a room. I think that would even depend on the circumstances. If it was a room with an automatic lock and the defendant didn't see the key turn, even that wouldn't be indicative of custody because it would lock in every case for everybody who happened in that room. That's not the case here. No, but I'm just saying a locked room isn't even a necessary indicia. If they made a show of locking the door and closing him in, then it might be a little more suspect. But even that, standing alone is not enough. It should be remembered the officers told the defendant that he was free to leave at any time and that if he wanted to go home, they'd be glad to drive him. So even if the room was locked, all he had to say is, look, I'm out of here, let's go back. And according to their promise, they'd be obligated to do it. If they did not keep that promise, we'd have a different case. But the defendant never said anything of the kind. Well, if somebody's in custody, it's really a fact question for the trial judge, is it not? Absolutely. And that's why I emphasized the trial judge's findings at the beginning of this argument. He did say that he found the officers very credible. On this last issue, is there a factual dispute on that? The idea that they told him, you can leave whenever you want, we'll take you home whenever you want. Is there a factual dispute about that? Does the defendant acknowledge that the officers made those statements, or does he have a different version? I can't remember, but it doesn't matter at this point because the officers were found to be credible, and that was very specific testimony that they gave. They did recall that point. So the defendant was never subjected to any sort of interrogation techniques. The officer simply said, we want to talk to you about possible allegations of inappropriate touching. And the defendant immediately responded with the name of a different victim. They then asked him about the victim in the case, and he gave details on that as well. So they didn't use any kind of interrogation techniques. They didn't pressure him. They didn't do anything but ask him single, open-ended questions. Well, the officers knew what they wanted to question him about. There's no question that's why they asked him to come down to the police department. They wanted to talk about these allegations of molesting children, correct? Correct. And she raises an interesting point. Why then wasn't he Mirandized as soon as he got there? Why did they start asking him incriminating questions and then later on give him his Miranda rights? Possibly because they didn't feel they had enough information to arrest him, and he wasn't in custody, so Miranda wasn't necessary. Miranda is necessary only for custodial interrogation. If it's an open-ended discussion, even at the police station, and that's what Stansberry says, it doesn't matter that he isn't given Miranda rights. I think we're well aware of that. What is this argument about Seberg? Does that apply here? No, I don't think it does for the reasons that Your Honor gave. Our position, as you well anticipated, is that he wasn't in custody at all. And if Seberg requires custody, then it's not a factor in this case. And as Your Honor also pointed out, this becomes a circular argument, that Seberg applies because he was in custody, he's in custody because Seberg applies. Did I also point that out as well? You alluded to it, yes. I believe you did, actually, Your Honor. Now, really, couldn't Cargola's presence when the defendant was questioned, as someone that the defendant did know and who was friends with the family, have caused the defendant to feel pressured to confess in a way that he wouldn't have if it was some other police officer or detective that he didn't know? Well, the defendant indicated that he wasn't even that good of friends with Cargola. That was in the record. Did he correct it to say he was just an acquaintance? Just an acquaintance, yes. That was the word. Thank you. And the defendant also, the thing about him being a friend could work both ways. He could have relied on him as a feeling of support. If to back him up, if he decided not to talk, he might have found it to be kind of, you know, well, he's my friend, maybe I can confide in him. I certainly wouldn't have felt that way, but he could have had that feeling which may have made him more ready to confess. The defendant didn't exactly explain how Mr. Cargola's presence at the interrogation influenced him, and anything we might say on that would be sheer speculation. So it could go either way. Unless the defendant said, look, he was my friend, I knew him. When he started asking me questions, I fessed up. It might also be that if he was a friend, the defendant wouldn't want to admit these acts to somebody he actually knew. It's highly embarrassing to admit these sorts of things. The fact that he knew the man could go so many different ways, and without explicit testimony from the defendant that would be believed by the trial court, unlike the testimony the defendant gave, which was that they were just acquaintances. I don't think you can draw any conclusions from the fact that they knew each other. Counsel, what about the evidence of other offenses? It's been held that that can be the erroneous admission of other offenses, that that would be withholding. It's generally considered to have a tremendous prejudicial impact on a defendant's right to a fair trial. Sometimes it's frequently argued that jurors will jump caps to the evidence once they hear the defendant has a prior background or has other offenses of this nature. So she was making an argument the trial judge juror did not properly balance all of these factors. So what is your argument or response to that argument? Again, it's been quite some time since I read the record, and this wasn't raised specifically. I don't believe anyone asked the trial judge for further information. And had it been requested, the trial judge may well have explained himself further. But even going beyond that, the statute that's 725 ILCS 5-515-7.3 permits evidence of other offenses in these types of cases to be used for propensity. So the prejudicial, the so-called prejudicial impact is built into the statute. Now, there has to be, I'm sorry, for that there has to be threshold similarity in the offenses, correct? Absolutely. And in this case, there actually were some significant differences, weren't there? There were also. I'm sorry. No, I was just going to say in terms of the earlier incident, or I'll just use the initials DN, there was an anal penetration, yet there was with the victim in this case, and wasn't that a significant difference? I think that what we were looking at was the similarity in the way that the defendant ingratiated himself with his child victim. I see. So he might have done different acts with them, but he got himself into their trust and became a friend with them in almost precisely the same ways, through overnight trips, through activities, through gifts, taking them out to movies or whatever it was he did. And he used almost precisely the same techniques to ingratiate himself with both these boys. And that was the similarity that was being focused on, more so than the precise sexual acts that were performed. Counsel, recognizing the statute does allow for propensity evidence as its terms, it also requires the trial judges not to balance the prejudicial versus the probable. So if the trial judge doesn't articulate how it did that, can an argument be made that it didn't comply with the statute, error, can the trial judge in this say in conclusion, I balanced the prejudiced versus the probable, and that's sufficient to comply with the statute? I think that if a request is made for further information, the trial judge might or might not be required to give it. But he complied with the statute in making that balancing test. Why would counsel have an obligation to ask the judge to further define his ruling? If the argument made the judge has a sua sponte obligation to articulate the reasons and how he balanced the factors? I don't think a defendant can come up to this court and claim error when he didn't try to cure the error in the trial court in the first instance. And that would be involve bringing up, you know, asking the trial judge to further elucidate his reasoning. It should also be noted that counsel claimed today that this disenabled the defendant to do his defense. And if I were working on the defense and didn't have a basis for the ruling and felt it was necessary, I would certainly ask. The defendant didn't ask if I recall the record correctly, and consequently the ruling should stand as it was given. So you can – is there a line of cases that support your argument that if there's an affirmative – let's assume a statute places an affirmative obligation on the trial court to do something, and it doesn't, unless counsel comes forward and asks the court to do something, they waive any error? The trial judge complied with the statute in saying that he balanced the prejudicial effect with the probative value of the evidence. That's what the statute required him to do, and he said that he did so. What the defendant wants is further information, and the statute doesn't require an itemized list of everything that the trial judge considered. If the defendant wanted such a list, in order to bring it before this court, at a minimum he was obligated to ask. The trial judge complied with the statute. He said he balanced the prejudicial impact against the probative value. This evidence clearly had a strong probative value for the reasons that I've explained because it showed the defendant's operations in ingratiating himself with these children, and consequently the evidence was properly admitted. What about the jury, Judge? I was just going to ask. I'm afraid I have to agree with Justice Zinoff. I have a little bit of trouble understanding the nature of this argument. The bill of particulars was argued extensively in the trial court. The prosecution said that they interviewed this victim in order to get as much specificity as possible, and that's why we had the superseding indictments in this long process to try and elucidate exactly when these incidents occurred. But when you have a situation where you have a child who is being abused over a long period of time, that child is simply not going to be able to distinguish as to when each of these events occurred. So to say that the bill of particulars has to give date, time, and manner on every single offense, it's simply not possible in many of these cases. And consequently, to say that the jury instruction, to go even further, has to do what the State is not required to do, which is to require as an element of the offense that the precise dates and times be given, is simply unreasonable. Now, actually, there was a jury instruction where that was done. I think it was, wasn't it, on two counts, actually? Relating to two counts, I believe there was a jury instruction that did have a specific date. I think July 4th was one of the dates. Yes. And if the State was able to do that, then they met the defendant's request with respect to those. But as I said, with a child sex abuse case where the child had been abused over a long period of time, it's simply unreasonable to ask for that much specificity, and it's not required by indictment or instruction law. If there are no further questions. I have one very small question. Sure. There was a reference to a piece of equipment, landscaping equipment that was repossessed or somebody was trying to use a default payment on it. Do you remember what that was? It was a wood chipper, I believe. Was it a stump grinder or a stump grinder or something? I think it was a wood chipper. I'm not all that sure. There was a word there that I wasn't familiar with. We agree to affirm. Thank you. Thank you. Ms. O'Connell. Thank you. Just briefly, it was a wood chipper. The question during sentencing, which I started to talk on and then ran out of time, the state seeks to impeach a young man who claims that he was not inappropriately touched by my client. The state then seeks to impeach that testimony. I don't know why or I don't know how. And then the state brings up this wood chipper that my client had purchased and was in possession of the non-victim, Sean Wilford's parents. And this is one of the errors that we allege as far as what occurred at sentencing, that that evidence, it's not really evidence of anything. You shouldn't be able to impeach someone who says that something didn't happen. And they tried to say that this wood chipper, which was purchased by my client for $75,000, is in the possession of this individual's parents who own a landscaping business, that somehow this was hush money in order to allow this individual to come in and say that nothing had occurred. That was inappropriate. And that's why is that a error? They cannot impeach him because of what? Because there's nothing to impeach. He says it didn't happen. There's nobody else that says it happened. The victim says I was never inappropriately touched by Gregory Tomberg. The state wants, and Judge Anderson believes it because Judge Anderson says in rendering his sentence that there were at least three victims, including this individual who says that he was never inappropriately touched by my client. The state's argument is, as I understand it, that the reason that the SW came in and said nothing had occurred was because his parents had received the $75,000 wood chipper. But I understand that they're using that to impeach him, this hush money, whatever you want to call it. But again, your basic point is that the state is not allowed to impeach this non-victim. That there's some rule against them trying to impeach him? A sentencing? You're saying, yeah, that's my question. I don't know the answer to it. You're saying that the state cannot attempt to impeach him. Why is that they cannot? You said they could not effectively do it here because they didn't have any effective impeaching evidence in your opinion. Correct. You started out saying they just can't do this. They can't impeach him. You mean they weren't successful at it or there's some rule that bars them, some procedure rule that bars them from trying to impeach a non-victim? I believe to bring it up at sentencing without the ability for the defense to effectively cross-examine or to present any other evidence is wholly inappropriate. And again, the defendant was unable to cross-examine because why? Well, who is there to cross-examine? This is an argument that they proffer. This is argument made by the state. There's no witness that gets up and says... But where do we have these statements made by the state? And that's where I'm confused. I'm sorry. Where did this fellow make these denials then? He made the denials to members of law enforcement. So there's no... So at sentencing, I believe it is inappropriate. I also think that it was inappropriate that Judge Anderson ordered my client to pay restitution. I think it's very clear. You can't just get up on the stand and say I think that the ballpark figure for what we might have spent, but I don't have any receipts because we paid in cash, maybe, maybe it was covered by insurance, maybe it wasn't. It was somewhere between $600 and $900. Judge Anderson then low-balls it and gives it the $600 figure. I don't think that there's anything in the record or at the sentencing hearing that supports that finding. What difference would insurance make? Well, that was the testimony of Terry Mickow was that it might have been covered by insurance. So he doesn't know if he had any out-of-pocket expenses. Well, I mean, you're suggesting restitution is not available? It's something that's covered by insurance? No, not at all. But Terry Mickow's testimony was it might have all been covered by insurance. He just doesn't know. Right, but even if it was, he'd still be entitled to recover, right? Sure, he'd be entitled to recover whatever his out-of-pocket was. No, that's what I don't understand. I don't understand why he'd be limited to that. Why can't he recover the full amount and then his insurance company would have segregation rights perhaps, but I don't think there's some bar to him recovering the full amount. I don't think he's limited to his out-of-pocket because it's deductible in this situation for restitution. Well, then I guess I stand corrected. But the point is nothing was brought in as to what it was that he did or did not expend as far as counseling went for his son. It was merely his statements that this is what occurred. He testified clearly that he didn't have any of the receipts and did not recall the amounts of payment. Counsel, let's get back just very briefly to that issue of the alleged improper impeachment. Obviously, that occurred in the context of the sentencing hearing. It has nothing to do with the jury finding your client guilty. Correct. As you know, a judge is given broad discretion in a sentencing hearing. They can search anywhere within a reasonable bounds for evidence of aggravation, mitigation, and as you know, even hearsay evidence is a discipline in a sentencing hearing. It's considered to be irrelevant in real life. So in light of those well-settled legal principles, if arguably the trial judge allows something to be admitted on an issue going to the bias and interest of a witness that was improper, in light of the consecutive nature of sentences, what real practical impact is that going to have on this case? The fact that when Judge Anderson made his ruling, he said there were three victims. There is no relevant, there is no reliable evidence that was presented at the sentencing hearing or at the trial that would allow the court to conclude that S.W. was in fact a victim at my client's hands. How many mandatory sentences were imposed on this case? The mandatories? Wasn't there a lot of consecutive sentences? Sure. There were two mandatories and then the others were concurrent to the two consecutive as you went across the indictments. What were the mandatory sentences, each mandatory sentence? Fifty and fifty. That's how we get to the hundred. Everything else was concurrent to each fifty. Can you remind me again? Sure. I know you're saying that the arguments at sentencing were impeaching S.W.'s denial of having been molested. Correct. Where's the evidence that he was molested? I don't know. Well, I mean, it had to be something. You don't have any idea? They just walked into court at sentencing and said, here's a fellow that denies he was molested? I'm sorry, I misunderstood your question. The state concludes that S.W. must have been molested at the hands of my client because of pictures that they find in my client's possession. So they conclude that because these pictures are there, my client must have taken those pictures and my client must have sexually abused S.W. And did your client say anything in any of his statements about S.W.? No. No. They're basing this entirely on the photographs that were passed around? Yes. And just to address one last issue that Your Honor brought up, it is in the record my client did testify that he was never told that he was free to leave and he was never told that he did not have to talk to the officers. That was my client's testimony. So with that, I would ask that this Court strongly consider and reverse this case and send it back for retrial. Thank you. Thank you.